*Philadelphia, Saturday, April 10.*

TONER *against* TAGGART administrator of TONER.

THIS was an appeal from a *prô forma* decree of the Orphan's Court of *Philadelphia* county.

*A* deposited in the hands of *B* at different times, for a purpose which he said he had mentioned to *B*, 10,000 dollars, for which he refused to take receipts.

The appellee, who was administrator of *Philip Toner*, filed his account in the register's office; and the auditors to whom it was referred, found a balance in his hands of

At the same time he had various dealings with *B*, and paid him money, for which receipts were taken. *A*, who had been brought up in *B*'s store, and assisted by him in business, often expressed his gratitude, said that he owed *B* every thing, and that in case of his death, *B* or his family should not lose by it. Being in ill health, he was pressed to make a will; but replied " *B* (or his family) *should be secured whether or not.*" At another time he said he would leave 8000 dollars to one of *B*'s children  At a third time he said that he was worth 20,000 dollars, that half of it was enough for him to trade on, and that he had placed, or meant shortly to place, the remainder in *B*'s hands, for the proofs of his friendship on opening store &c. and would leave what he died possessed of to *B*'s family. After *A*'s death a paper was found in his pocket book with his signature, in these words: " I " acknowledge to be indebted to *B* in the sum of 8000 dollars, value received of him. " *Philadelphia, June* 15, 1805." This date was about the time of his saying that *B* should be secured whether or not.

*Held*, that under the circumstances of the case, this writing should be considered as evidence of a debt due by *A* to *B*; and that *B*, who took out administration to *A*, might retain the amount as in case of a debt. But that it was not a testament, and if it was, it must be proved in the register's office, before this Court could give it effect.

10,233 dollars 38 cents, of which 2233 dollars 38 cents was passed to the credit of *Toner's* estate, and 8000 dollars credited to the appellee as retained by him, under the circumstances hereafter stated. Upon this report a decree passed in his favour without prejudice, and an appeal was entered on behalf of the next of kin.

The facts were in substance these: *Philip Toner* the intestate, died in *November* 1805, unmarried, and without issue, leaving as his next of kin, four sisters in *Ireland*, and a brother recently arrived in the *United States*, who was with him when he died. He left personal property to the amount of about 20,000 dollars. *Toner* was brought up in the appellee's store, possessed his confidence, was ultimately employed as his clerk, and had the receipt of his cash. In 1800 he entered into business on his own account, in the grocery line, which was that of *Taggart* also; and by his bank books it appeared, that within a few months afterwards, his deposits amounted to ten thousand dollars, although he began without any visible property, and had not until after this taken up even the wages due to him as clerk, amounting to about a thousand dollars. The friendship of *Taggart* was variously manifested to *Toner* in his new business; and they had occasionally together transactions of buying and selling. On the 2d of *January* 1804, *Toner* paid to *Taggart's* clerk a balance of 60 dollars 61 cents, due for merchandize, and took a receipt; and at the same time gave him a check for 4000 dollars, for which he refused to take a receipt, saying that he had a reason for it, and that he meant to put 10,000 dollars into *Taggart's* hands, for a certain purpose, which he had mentioned to *Taggart*. At different times between this and the 21st of *June* 1804, *Toner* paid to *Taggart* 10,000 dollars, always taking receipts for what he paid upon a merchandize account, and refusing them for the component parts of this sum, no part of which was ever withdrawn from *Taggart* during *Toner's* life time. To one witness *Toner* said that he should not have been worth a cent but for *Taggart*, and that he should leave 8000 dollars to one of *Taggart's* children. In 1804 he informed another witness that he was possessed of property to the amount of more than 20,000 dollars; that half of that was sufficient for him to trade on, and that he had placed, or meant shortly to place, the remainder in *Taggart's* hands, for the proofs of

Toner
v.
Taggart.

friendship he had received on opening store, and afterwards; that what he should die possessed of, he meant to leave to *Taggart* and his children, of whom the third child should have the greater part; and he requested the witness to make a will for him accordingly, but it was never done. In 1805, *Toner's* health became impaired by the intemperate use of spirituous liquors. In the summer of that year he went to *Cape May*, where in conversation with a respectable clergyman, he said he owed every thing to *Taggart*, and that in case of his death, *Taggart*, or his family, the witness was not sure which, should not lose by it. The clergyman advised him to make a will. He replied that *Taggart*, or his family, *should be secured whether or not*. He returned to the city, and died in the *November* following. After his death, when the appellee was making search among his papers, for a will which it was supposed he had left, the following memorandum in the handwriting of *Toner*, was found in his pocket book. " I acknowledge to be indebted to Mr. " *John Taggart* in the sum of eight thousand dollars, value " received of him. *Philadelphia*, *June* 15, 1805. *Philip* " *Toner.*"

*J. R. Ingersoll* and *Tilghman* for the appellant. It is impossible to doubt that the intestate entertained a purpose of bounty to *Taggart* or his family, or to some one of them, though to which is extremely uncertain: but it is sufficient for the next of kin, that whatever this purpose was, it was inchoate and unexecuted during his life, and has not been completed by any instrument to which the law can give effect as a will.

That it was not effectual during his life, is manifest. He kept the paper privately in his own custody, he did not make it known to any body, and he therefore retained, and intended to retain, a control over it during his life. During his life then it was a matter merely initiate, designed perhaps to be carried into effect by a will, but *per se* nothing; and he probably was prevented from thus carrying it into effect, by the recollections of his family in *Ireland*, and the arrival of his brother the appellant. The case strongly resembles *Disher* v. *Disher* (a). There *Disher* by a note un-

(a) 1 *P. Wms.* 204.

der his hand, promised to pay his brother 5000*l.*, and kept the note in his own custody; but his brother knew nothing of it until after *Disher's* death, when the note was found among his papers. The lord keeper decreed that it should be looked upon as a matter initiate or intended, and never perfected, and that it was no debt at all. To give it effect, there should have been a delivery, or something equivalent.

It cannot take effect as a will, because it has nothing testamentary in its nature, and was not so intended by *Toner.* By his conversation with the clergyman, he shews that he had no idea of having made a will, at a time subsequent to the date of the instrument. But whether will or not, it cannot be set up as a will in this Court at present. An administration is outstanding, and the administrator is now a party. While this is the case, intestacy must be presumed. This Court cannot take jurisdiction of a will of personal estate, in the first instance; it must be proved before the register. If it is a will, it defeats all the proceedings below, which are founded upon an intestacy.

The testimony of none of the witnesses supports the instrument. To one the language of *Toner* was, that he would leave 8000 dollars to one of *Taggart's* children; to another, that what he should die possessed of he meant to leave to *Taggart's* children, particularly the third eldest; and to a third, that in case of his death, *Taggart* or his family should not lose, and that whether he made a will or not, he or his family should be secured. This last expression is certainly the most to the purpose of the appellee. But it was made after this writing. The language is prospective, it promises some future act, which was never performed.

How is this paper to take effect? Not as evidence of a debt, because of that it is but *prima facie*, and on examination of the accounts, it appears that he was not indebted, but a creditor to a large amount. Not as an appropriation, because in form there is nothing like it, and in substance there can be no appropriation unless there is notice, or something to make the act irrevocable on the part of him who appropriates.

If there was an intention on the part of *Toner* to give 8000 dollars to *Taggart*, consummated by a final act, the money is his. If he ever alluded to the paper as an act completed with that view, it will answer; but there is nothing of

1813.

TONER
*v.*
TAGGART.

that kind. The manner in which *Toner* obtained the money, and the motives which led to his conduct, are of no importance; except, that to allege as *Taggart* has done, that *Toner* robbed him of it, cancels all the equity that he might otherwise have.

*Hopkinson* and *Ingersoll* for the appellee. The conduct and the motives of *Toner* are involved in the greatest mystery. The only satisfactory explanation which any one can give, is, that having erred in the outset of life, he felt an honest disposition at the close of it to remedy the error, without having resolution enough to confess it. The expedients he resorted to were intended to satisfy his conscience, without wounding his pride. That he intended this money for *Taggart*, no one can doubt; the only question is whether his intention has been carried into effect. We contend that it has, in a manner which distinguishes the case from *Disher* v. *Disher*, and all other cases of mere promissory engagements; namely, by the deposit of the money in *Taggart's* hands, and the refusal of receipts, while for all other transactions he uniformly took them, and by the execution of this instrument to prevent his representatives from ever reclaiming the money. Here was intention consummated by two unequivocal acts; and to the last of them, it is clear that *Toner* alluded as an act done, when he said, that whether he made a will or not, *Taggart* should be secured.

Cases of this sort turn upon the intention of the party. In *Disher* v. *Disher*, the note was set aside, not merely because it was a promise never communicated, but because the promisor subsequently married. In *Naldred* v. *Gilham* (a), the case of a voluntary settlement, made by an aunt, in favour of her nephew, and kept in her possession, the Court did not go upon the ground that there was a want of delivery, but on the ground of her not intending to be bound by it, which was manifested by her refusing to give a copy to her nephew and his friends, although when she made a second settlement in favour of another person, she gave possession of it. So in *Ward* v. *Lant* (b), where a father executed a bond to his daughter, payable immediately, but always kept it by him in his lifetime, and it was found after his death

(a) 1 *P. Wms.* 577.          (b) 2 *Eq. Abr.* 283.

among his papers, it was decreed to be set aside, not upon the ground of non-delivery, but on the ground of intention, the father having executed it only to protect him from paying taxes for his money. But where intention supports the deed, it is enforced even against a subsequent will, though it be purely voluntary, and never out of the party's possession. *Boughton* v. *Boughton* (a), *The Lady Hudson's Case*, cited in *Clavering* v. *Clavering* (b), *Seton* v. *Seton* (c).

The writing in question may take effect in various ways. First, as an acknowledgment of *debt;* and if the party confesses it, who shall deny it, particularly under circumstances like these, where the funds with which *Toner* commenced his business, are involved in such mystery. By *Taggart's* books it is true there is no debt by *Toner;* but *Toner's* whole conduct shews beyond all doubt, that he knew of transactions which did not appear on *Taggart's* books.

It may take effect as an appropriation, because the money was already paid to *Taggart*, and the only doubt is for what purpose, which this writing distinctly points out.

It may also be used as a testament; not in support of an action for recovery of money, because to that probate is essential, but by way of defence. *Toner* intended this instrument to be used after his death; and almost any thing, a letter, a memorandum, if so intended, may be proved as a testament. But if there is any difficulty about the technical character of *Toner's* act, whether debt, appropriation, or testament, there is clear evidence of intention connected with acts, to benefit *Taggart* to the extent of 8000 dollars, and this Court, proceeding upon equity principles like the Orphan's Court, will never compel him to account for that sum.

TILGHMAN C. J. after minutely stating the facts, and the writing found after *Toner's* death, delivered his opinion as follows:

It has been contended by the counsel for the appellant, (the decree having been entered in the Orphan's Court by consent, in order to bring the case before this Court) that this writing was no more than an inchoate act, which was never completed. That *Toner* by keeping it secretly in his

(a) 1 *Atk.* 625.        (b) 2 *Vern.* 476.        (c) 2 *Bro. Ch. Rep.* 611.

own hands, shewed his intent that it should have no effect during his life, and that as a will it could not operate, having nothing about it of a testamentary nature. On the other hand, the counsel for the appellee argued, that it might take effect either as a will, or as an appropriation of so much money of *Toner* in the hands of *Taggart*, or as an evidence of a debt due from *Toner* to *Taggart*. It does not appear to be of a testamentary nature, nor if it were, can we establish it as such in this collateral way. Every kind of will must be proved before the register, although in case of dispute it may be brought into this Court by appeal. If effect can be given to this writing, it is our duty to give it, for it certainly was the intention of the intestate to do something considerable for *Taggart* or his family. It is confessed that if *Toner* ever alluded to that paper as an act done in favour of *Taggart*, it would be sufficient for its establishment. Now it is clear to me that he did allude to it, when he told Mr. *Potts* that *Taggart should be secured, whether or not.* This declaration must probably have been made shortly after the date of the writing. It is objected that " *should be secured*" must have reference to a *future* act. But I think nothing of that objection; it is founded on a grammatical criticism, which is easily obviated, by reflecting that *Toner* might not have been an accurate grammarian, or that Mr. *Potts* might not have recollected the precise expressions made use of. The writing is exactly what such a person as *Toner* might have supposed to be a sufficient security, in case of his death without a will. It is material that *Toner* never drew his money out of *Taggart's* hands, persevering to his death, in his purpose of appropriating 8000 dollars to *Taggart's* use. No doubt the paper remained in his power, and if he had made a will, it is probable that he would have cancelled it. But not having made a will, and the writing remaining in existence, it serves to answer the very purpose intended. But it is objected, that so far from being in *Taggart's debt, Toner* was his creditor to a great amount at the date of the writing. He certainly was so, as far as we have any certain evidence by books and papers. But there may have been secret transactions unknown to us. It has not been made to appear in what manner *Toner* acquired the considerable sums deposited in bank soon after he opened his store. Conjectures have been made,

but they are only *conjectures.* The matter has not been ac-
counted for. It is involved in something of mystery. Why
then, when the man has said, that *he was indebted,* and when
he undoubtedly intended to throw at least 8000 dollars into
the family of *Taggart,* shall we take pains to defeat his in-
tention, because we cannot discover how the debt was con-
tracted. No evidence is so strong as a man's own confession,
and I am content to take the fact as *Toner* has stated it. I
take no particular notice of the cases cited on the argument,
because it is a matter of intention to be inferred from all the
circumstances of each case. Enough appears to satisfy me
that the intestate kept this paper by him with a view of se-
curing to *Taggart* 8000 dollars, and therefore I am of
opinion, that the decree of the Orphan's Court should be
affirmed.

YEATES J. was prevented by sickness from giving any
opinion.

BRACKENRIDGE J. The placing the amount of 10,000 dol-
lars and upwards in the banks of this city, without any visi-
ble funds from whence that could come, induces the suspi-
cion that it must have been detracted *occasionally* from the
money of the master, so as not to be missed. The master,
*Taggart,* would seem from the testimony to have entrusted
him with the handling of his cash. It could not *reasonably*
be supposed to have been from private speculation, or from
his wages saved for five years. One thousand dollars and
upwards for wages is charged in the book of *Toner* to him-
self, as received after this deposit in the banks. This embez-
zlement was probably with the original intention of replacing
the money as soon as he should be able; and under this idea,
without supposing him ultimately to have intended a fraud,
he might have reconciled it to his conscience. In pursuance
of this intention, and having been fortunate in business, in
less than five years, he actually places in the hands of *Tag-
gart,* the master, through the medium of his clerks, and had
entry in his books to the amount of 10,000 dollars, for which
he would take no receipt, whereas with regard to other
credits for monies in those books he took receipts. I would
take the 8000 to be the sum originally embezzled, and this,
with the addition of one-fourth, according to the law of

*Moses*, in the case of *restitution*, to have accounted for the placing the 10,000 dollars; two thousand the one fourth of eight thousand. It would seem to have been a struggle in his mind how to get the restitution accomplished, without avowing the original breach of trust, which he had not resolution to do, and which he may have thought was not necessary to be done, provided the same justice was rendered, and the original replaced with what would, at least, cover the interest. It is evident that he sometimes thought of a devise to *Taggart*, or some of his children, and it is probable that the coming of his brother from *Ireland*, and the *dulcis moriens reminiscitur Argos*, the idea of unkindness in giving so much to a rich man, and neglecting *pro tanto* his poor kindred, was in his way. But for this all might have been set right by a will. But it would seem to relieve from this, to acknowledge himself to have been indebted originally in the sum taken, the 8000 dollars. This was done by the memorandum left behind him, and may be considered as a credit in the way he intended it, as a set off against the claim which his relations might advance to the surplus in the hands of *Taggart* as a trustee for the use of *Toner*. The document would rebut the idea of a trust, so far at least as the sum of eight thousand dollars.

The mind of *Toner* would seem to have occasionally vibrated on the ways and means by which he might conceal his shame, and satisfy his conscience. He had spoken of a devise under the idea of a sense of gratitude for assistance in setting up and carrying on business; this possibly the better to hide the real consideration. He was advised by a witness (*Potts*) to make a will; and he had been speaking of making a will in favour of *Taggart*, under this consideration of gratitude. The expression in the reply of *Toner* is remarkable: " Mr. *Taggart* and his family should be se-" cured whether or not." This was in the summer of 1805; and the securing must have had a reference to the money which he had placed on the books of *Taggart*, taking no voucher, or to that instrument which he had in view to leave, and did leave behind him. Either of these, or both, would seem in his opinion to secure *Taggart*. I need not say whether this paper could be proved as a testamentary paper, but it must come through that medium before it could be acted on as a gift by devise. But as giving it an operation by way of

credit, I can have no difficulty. I could by no means recon-
cile it to myself to consider it otherwise. I am of opinion
therefore that the sum of 8000 dollars be placed to the cre-
dit of *Taggart* the administrator in this case.